(81 South. 869)

No. 21677.

BENDERNAGEL et al. v. FORET et al.

(March 31, 1919. Rehearing Denied May 5, 1919.)

*(Syllabus by Editorial Staff.)*

1. ADVERSE POSSESSION ⬤═80(2), 84—DESCRIPTION—DEEDS.

It is not sufficient, to support a plea of prescription of 10 years, that the description in the deed relied upon might be construed to include the land in question; it being necessary that the deed relied upon is prima facie, not merely that the purchaser believed it to be, translative of the property in question, but as to the title it is sufficient that the purchaser in good faith believed that his vendor owned the property.

2. DESCENT AND DISTRIBUTION ⬤═72—ACCEPTANCE OR RENUNCIATION OF SUCCESSION.

Under Civ. Code, art. 1030, declaring that the faculty of accepting or renouncing a succession becomes barred by the lapse of time required for the longest prescription of the rights to immovables, means that one right or the other, either the right to accept or the right to renounce, whichever right or faculty the heirs should have exercised before the lapse of 30 years, is prescribed at the end of the 30 years, in view of articles 940, 941, 1013–1015, 1017, 1023–1028, 1030, and 1031; and as against a mere possessor without title and without the benefit of prescription acquirendi causa, an heir at law, who is invested with seizin or the right of possession by mere operation of law and without having to manifest an intention to accept the succession, does not lose his right to accept by failing to exercise it within 30 years.

3. APPEAL AND ERROR ⬤═1050(1)—HARMLESS ERROR—ADMISSION OF EVIDENCE.

In an action involving the title to land, a warrantor, who had joined defendants in the defense of the suit only for the purpose of having an opportunity to aid in defending the title of the defendant, was not prejudiced by the exclusion of evidence as against him, and its admission against the defendants, against whom it was admissible.

Monroe, C. J., dissenting.

Appeal from Twentieth Judicial District Court, Parish of Lafourche; Charles T. Wortham, Judge ad hoc.

Suits by the Widow John Bendernagel and others against Davis J. Foret and others, by Dominique Harang and others against Davis J. Foret and others, by Delia Harang and others against Davis J. Foret and others, and by Dominique Harang and others against the Choctaw Planting Company, consolidated. Judgment for plaintiffs, and defendants appeal. Affirmed.

Caillouet & Caillouet and W. E. Howell, all of Thibodaux, for appellants Mrs. J. Foret and others.

Beattie & Beattie, of Thibodaux, for appellant Choctaw Planting Co., Limited.

J. A. O. Coignet, of Thibodaux, for appellant D. J. Foret.

Howe, Fenner, Spencer & Cocke, of New Orleans, for appellant Mortgage Securities Co.

D. V. Doussan and Charles T. Starkey, both of Thibodaux, for appellees Bendernagel and others.

O'NIELL, J. These suits, which were consolidated for the purpose of the trial, are petitory actions, in which the plaintiffs claim certain undivided interests in the tract of land to which their title was recognized in the case of Dominique Harang et al. v. Bowie Lumber Co. (No. 21,678) 145 La. 96, 81 South. 769. In that suit the present plaintiffs obtained judgment for the value of the forest timber taken from the land by the Bowie Lumber Company under a title derived from William R. Taylor, from whom the defendants in these suits claim title to the land. Plaintiffs' title is the same that was recognized in favor of two of them for an adjacent tract of land, in the suit of Dominique Harang et al. v. Golden Ranch Land & Drainage Co., 143 La. 982, 79 South. 768. For an understanding of the lay of the land, reference may be had to the printed sketch appearing in the report of that case.

The tract of land in contest here is bounded on the north by what is called "the 80-

arpent line" (dividing this tract from that which was in contest in the Golden Ranch Case), being a line drawn 80 arpents north from, and parallel with, Bayou Lafourche; the tract is bounded on the south by "the 40-arpent line" (drawn 40 arpents north from, and parallel with, Bayou Lafourche); on the east or northeast by a line bearing N. 9° W., as shown on the aforesaid sketch; and on the west by "Lot 46 of the Bourgerol Plan."

· The plaintiffs in these suits obtained judgments again recognizing their title to the land; and the defendants and a warrantor prosecute this appeal.

There is no reason for repeating here the opinion given in the case of Dominique Harang et al. v. Bowie Lumber Co., which was in most part a repetition of the opinion that had been rendered in the case of Dominique Harang et al. v. Golden Ranch Land & Drainage Co. For we will assume that, if the title derived by the defendants through mesne conveyances from Oscar Lepine embraces the land in contest, their title is protected by the prescription of 10 years.

Oscar Lepine sold to Tresimond Foret, on the 25th of April, 1880, a tract of land described as follows, viz.:

"All that portion of the following described tract of land lying and being situated in front of the 80-arpent line from Bayou Lafourche, and comprised between the Bayou Vacharie and Harang's Canal, to wit:

"A certain tract of land known and designated as the Vacharie Charbonnet, comprising twenty thousand and sixteen arpents and fifty-six hundredths of an acre in superficies, situated in the parish of Lafourche in this state, and bounded by the Bayou la Vacherie, which separates it from the plantation now or late of Charles Derbigny, and which is navigable as far as Lake Washa or Barataria, by Bayou Catahoula, and by lands now or lately belonging to Enoul Dugue Livaudais, the whole according to plan of A. H. Rightor, deputy surveyor.

"For the title of the vendor to the property herein conveyed reference is hereby made to the following records in this [the recorder's] office, to wit: Conveyance Book No. 16, pp. 64 to 65; same book, pp. 245 to 248; and same book, pp. 429 to 431."

Tresimond Foret sold the land, by the same description, to Joseph A. Boudreaux, on the 13th of August, 1892; and he sold a half interest in the land, by the same description, to Ernest Foret, on the 25th of July, 1899. That is the latest of the deeds that were 10 years old, in the defendants' chain of title, when prescription was interrupted by service of citations in these suits.

The next transfer was a sale dated the 3d of February, 1903, by Joseph A. Boudreaux and Ernest Foret to William R. Taylor, from whom defendants in these suits derive their titles. In the deed to Taylor, the description of the Oscar Lepine tract was altered so as to include the land now in contest, being the land included between the 80-arpent line and the 40-arpent line, and extending westward from the line bearing N. 9° W. to the eastern boundary of lot 46 of the Bourgerol Plan. But, as that deed was not quite 10 years old when prescription was interrupted by the service of citation in these suits, the plea of prescription of 10 years depends upon defendants' contention that the previous transfers—i. e., the sale from Oscar Lepine to Tresimond Foret, from Tresimond Foret to Joseph A. Boudreaux, and from Joseph A. Boudreaux to Ernest Foret —were prima facie translative of title of the land in contest. Whether the description in those deeds did or did not include the land in contest depends upon whether the western boundary of the land described was, as defendants contend, the eastern line of lot 46, or was, as plaintiffs contend, the line bearing N. 9° W.

In the case of Harang et al. v. Golden Ranch Land & Drainage Co., and again in Harang et al. v. Bowie Lumber Co., it was demonstrated, to the satisfaction of a majority of the members of this court, that the western or southwestern boundary line of

the land acquired by Oscar Lepine was the line bearing N. 9° W. (as shown on the printed sketch referred to), and that Lepine's title, therefore, did not include the land in contest. And again, in the case of Harang v. Bowie Lumber Company, it was demonstrated to the satisfaction of a majority of us that the description by which Lepine sold to Tresimond Foret, by which he sold to Boudreaux, and by which Boudreaux sold to Ernest Foret, did not include the tract of land the title to which was then and is now in contest, or any land west of the line bearing N. 9° W.

Conceding that it may appear now, in the light of the facts disclosed by plaintiffs' attorneys, that the description in the foregoing transfers did not include the land now in contest, defendants' attorneys argue that, as the Rightor map referred to in those deeds was not then recorded, Tresimond Foret, in 1880, Joseph Boudreaux, in 1892, and Ernest Foret, in 1899, might well have believed that the description in their deeds included this land.

[1] We do not consider it sufficient, to support a plea of prescription of 10 years, that the description in the deed relied upon might be construed to include the land in question. It is necessary, to sustain the plea, that the deed relied upon is prima facie—not merely that the purchaser believed it to be— translative of the property in question. As to the title, of course, it is sufficient, to sustain the prescription of 10 years, that the purchaser, in good faith, believed that his vendor owned the property; but, as to the deed being upon its face translative of the supposed title, the description must include the property in question. See Albert Hanson Lumber Co. v. Angelloz et al., 118 La. 861, 43 South. 529, where the defendants based their plea of prescription of 10 years upon a deed containing an error in the section number, which had been corrected, and as to which it was said:

"Until the correction was made, defendants had no title to the land in dispute, and therefore have not possessed for 10 years by virtue of a title."

That language is particularly appropriate here, where it appears that William R. Taylor, who bought the land in contest less than 10 years before these suits were filed, deemed it necessary, in order to describe the land in question, to make a material change in the description contained in the title deed of his vendor, and in the title deed of every preceding vendor of his vendor, for a period of 49 years back. We refer to the fact that, in the sale from Boudreaux and Foret to Taylor, there was omitted, for the first time in the defendants' chain of title, the reference to the plan of Á. H. Rightor, deputy surveyor; and, for the first time, there was substituted, for the boundary "by lands now or lately of Enoul Dugue Livaudais" (the western or southwestern boundary of the land conveyed), the boundary "by the lower line of the above-described lot 46." In making the change in the description, in the deed to Taylor, the parties committed the error of reversing the boundaries on the east and west; for that part of the description reads:

"Bounded above or east [meaning west] by the lower line of the above-described lot 46 and on the lower side or west [meaning east] by Harang Canal and Bayou Catahoula."

Notwithstanding those important changes in the description by which Taylor's vendors had bought, it was declared in his deed that the lands he bought from Boudreaux and Ernest Foret were—

"the same lands bought by Tresimond Foret from Oscar Lepine * * * on August 13, 1892, and which lands were afterwards sold by the said Tresimond Foret to Joseph A. Boudreaux, and the undivided half of which was afterwards sold by the said Boudreaux to Ernest Foret."

In the same deed by which Taylor bought the land in dispute, he bought the timber on

lot 46, the description of which, in the deed, precedes that of the land in dispute; hence the reference to lot 46 as "the above-described lot 46."

Even though it might be assumed that Taylor, in good faith, believed that his vendors, Boudreaux and Foret, owned the land in dispute, extending westward from the line bearing N. 9° W. to lot 46 of the Bourgerol Plan, his good faith would be of no avail to the defendants, because, as we have said, Taylor's deed was not 10 years old when prescription was interrupted by service of citation in these suits.

Assuming, however, for the purpose of the argument advanced by counsel for the defendants, that it would suffice, to sustain the prescription of 10 years, that Boudreaux and the Forets believed that the description by which they bought included the land in dispute, we think that the record demonstrates beyond all doubt that they knew that the land in dispute (described in their deeds as "lands now or lately belonging to Enoul Dugue Livaudais") separated the two tracts which they bought; i. e. (1) Lot 46 of the Bourgerol Plan; and (2) the tract bounded on the west or southwest by the line bearing N. 9° W. With the light in which they read their title deeds, Tresimond Foret, on the 26th of April, 1880, Joseph A. Boudreaux, on the 13th of August, 1892, and Ernest Foret, on the 25th of July, 1899, knew that the two tracts which each in turn acquired were separated by the tract now in dispute, described in each of their deeds as "lands now or lately belonging to Enoul Dugue Livaudais."

Defendants' counsel say, in their brief, that Boudreaux and the Forets acquired, by the description in their deeds, "all of the land in front of the 80-arpent line comprised between Bayou la Vacherie and Harang's Canal." But that is not the way the description reads. According to the exact language of the deeds, Boudreaux and the Forets bought all of that portion, lying and being in front of the 80-arpent line from Bayou Lafourche and comprised between Bayou Vacherie and Harang's Canal, of a certain tract of land then known and designated as the Vacherie Charbonnet, comprising 20,016 arpents and 56/100 of an acre, bounded by Bayou Vacherie, which separated it from the plantation then or formerly of Charles Derbigny, by Bayou Catahoula (being a continuation of Harang's Canal towards the north), and by lands then or theretofore belonging to Enoul Dugue Livaudais, the whole according to a plan by A. H. Rightor. It is true, the plan of A. H. (or A. F.) Rightor, showing the western boundary line of the land conveyed, bearing N. 9° W., was not then recorded. Hence it is argued by counsel for defendants that Tresimond Foret, in 1880, Joseph A. Boudreaux, in 1892, and Ernest Foret, in 1899, might have thought that the mention of the land then or theretofore belonging to Enoul Dugue Livaudais referred to lot 46 of the Bourgerol Plan, which had belonged to Francois Enoul Dugue Livaudais some time previous to March 23, 1878, on which date Marcelin Delaune sold it to Tresimond Foret.

It is not reasonable to suppose that Tresimond Foret then believed that the land referred to, for one of the boundaries of the tract he was buying from Oscar Lepine, as lands then or theretofore belonging to Enoul Dugue Livaudais, was lot 46 of the Bourgerol Plan, when he, only 2 years before, had bought, and yet owned, lot 46 of the Bourgerol Plan. Nor is it at all reasonable to suppose that Joseph A. Boudreaux thought, when he bought from Tresimond Foret, in 1892, that the land referred to, for one of the boundaries of the land he was buying, as lands then or theretofore belonging to Enoul Dugue Livaudais, was lot 46 of the Bourgerol Plan; for Boudreaux bought also lot 46 of the Bourgerol Plan from Tresimond Foret, by one and the same deed. It is likewise un-

reasonable to suppose that Ernest Foret was misled in that respect; because he bought from Joseph A. Boudreaux, by one and the same deed, first, an undivided half interest in lot No. 46, and, second, an undivided half interest in the tract described as in the deed from Lepine to Tresimond Foret and as in the deed from him to Joseph A. Boudreaux.

As a matter of fact, if Boudreaux and the Forets had bought all (lying south of the 80-arpent line) of the original Vacherie Charbonnet owned by Mrs. Louis Charbonnet, their title would have embraced all of the tract of land extending westward, not merely to lot 46 of the Bourgerol Plan, but to Bayou Coquille, which is a branch of Bayou Vacherie extending southward through lot 46. Hence there is no reason whatever to suppose that Tresimond Foret (in 1880) or Joseph A. Boudreaux (in 1892) or Ernest Foret (in 1899) believed that the mention of the lands then or formerly belonging to Enoul Dugue Livaudais, for one of the boundaries of one of the tracts of land that they were buying, had reference to lot 46 of the Bourgerol Plan.

An examination of the title to lot 46 of the Bourgerol Plan shows, in fact, that there was never any reason for any one to believe that the tract acquired by Oscar Lepine extended westward as far as lot 46. According to the old official surveys, Bayou Coquille (being a branch of Bayou Vacherie) crossed the northern boundary of lot 46 and ran in a southwestern direction through the lot, to a point near the southern boundary, where it curved eastward and crossed the eastern boundary of the lot near its southern end. That part of lot 46 lying on the west side of Bayou Coquille was acquired by Philip Enoul Dugue Livaudais, Charles Enoul Dugue Livaudais, and Francois Joseph Enoul Dugue Livaudais (as part of their share of the Fleurian grant) by the act of partition between them and their aunt, Mrs. Louis Charbonnet, on the 20th of August, 1812; and she acquired, by the same act, as part of her share of the Fleurian grant, that part of lot 46 lying on the east side of Bayou Coquille. Charles Enoul Dugue Livaudais acquired the interest of his co-owners (including Louis Harang and Francois Joseph Enoul Dugue Livaudais) in lot 46, on the 24th of August, 1838, and sold it to Francois Joseph Enoul Dugue Livaudais on the 1st of June, 1840. The title then passed from Francois Joseph Enoul Dugue Livaudais (whether directly or through mesne conveyances the record does not show) to Marcelin Delaune, who sold it to Tresimond Foret on the 23d of March, 1878; he sold lot 46 to Joseph A. Boudreaux (together with the land lying on the east side of the line bearing N. 9° W.), on the 13th of August, 1892; Boudreaux sold an undivided half interest in lot 46 (together with a half interest in the land lying on the east side of the line bearing N. 9° W.) to Ernest Foret, on the 25th of July, 1899; and Boudreaux and Ernest Foret sold the timber on lot 46 (together with the adjacent land on the east, extending, between the 80-arpent line and the 40-arpent line, eastward to Harang's Canal), on the 3d of February, 1903. Now it is apparent that Taylor's title to the timber on that part of lot 46 lying on the east side of Bayou Coquille came from the same deed by which the plaintiffs here acquired title to the land in contest; that is, the deed by which Mrs. Louis Charbonnet sold to the three Enoul Dugue Livaudais brothers that part of the Vacherie Charbonnet extending westward from the line bearing N. 9° W. to Bayou Vacherie and southward to the 40-arpent line. Jacques Filipe Enoul Dugue Livaudais sold his third interest in the land to his two brothers, Francois Joseph and Charles Enoul Dugue Livaudais, on the 11th of January, 1820; and they sold a third interest to Louis Harang on the 26th of February, 1828. The plaintiffs in these suits are the heirs at

law, respectively, of Louis Harang and the Livaudais, deceased.

Defendants' counsel lay much stress upon the fact that the tract of land acquired by Oscar Lepine (of which he sold to Tresimond Foret that part lying south of the 80-arpent line) was described as containing 20,016 arpents and 56/100 of an acre; whereas that part of the Vacherie Charbonnet on the east side of the line bearing N. 9° W. contained only 12,958 acres (15,426 arpents). The area of the tract acquired by Lepine was not a matter of importance to Tresimond Foret or Joseph A. Boudreaux or Ernest Foret, each of whom, in turn, acquired only that part of the Oscar Lepine tract lying south of the 80-arpent line. In other words, the area given in the deeds by which the Forets and Boudreaux acquired was not given as the area of the tract they acquired, but as the area of the whole tract of Oscar Lepine, of which the Forets and Boudreaux bought only the part lying south of the 80-arpent line.

The error in ascribing an area of 20,016 arpents and 56/100 of an acre to the tract containing only 12,958 acres (15,426 arpents) is explained satisfactorily by the testimony of a civil engineer, and by a comparison of the measurement between any two given points on the official Rightor survey with the corresponding measurement on the official resurveys made by two deputy United States surveyors, Haucke and Gorlinski. The testimony and the comparisons disclose, beyond all doubt, that Rightor used a short chain in the measurement of every distance; the ratio of his chain to the standard being as 1 is to 1.2. That ratio, of course, was squared, or was as 1 is to 1.44, in Rightor's measurement of rectangular areas, and it might have been even more out of proportion in his measurement of irregular shaped areas. According to mathematical calculations made by the civil engineer who testified in this case, if the lineal measurements made by Rightor were correct, the tract of land ac-

quired by Oscar Lepine (without the land in contest) would have an area of about 20,016 arpents; and that fact is verified by a comparison of the distance given on each course on the Rightor survey with the distance given on each corresponding course on the official resurveys of Haucke and Gorlinski. These mathematical calculations and comparisons of measurements leave no doubt that the tract of land acquired by Oscar Lepine, from whom the defendants claim title, did not include the land in contest.

[2] Defendants' counsel urge with much earnestness and ability their plea of prescription of 30 years, based upon article 1030 of the Civil Code, viz.:

"The faculty of accepting or renouncing a succession becomes barred by the lapse of time required for the longest prescription of the rights to immovables."

It is contended that we erred in our interpretation of the article in the case of Generes v. Bowie Lumber Co., 143 La. 811, 79 South. 413, and that that decision ought to be overruled. In that case, decided less than a year ago, we construed the article to mean what it says; that is, that either the one faculty or the other—either the faculty of accepting or the faculty of renouncing, whichever faculty the heir has an interest in exercising—becomes barred by prescription if that faculty be not exercised within 30 years. We called attention to the fact that, in the precise language of articles 940 and 941 of the Code, a succession is acquired by the legal heir immediately after the death of the person whom he succeeds, "by the operation of the law alone, before he has taken any steps to put himself in possession, or has expressed any will to accept it." And we observed that, in the precise language of articles 1014 and 1017 of the Code (the provisions of which articles did not appear in the French Code), he who is called to the succession, being seized thereof in right, is considered the heir so

long as he does not manifest an intention of divesting himself of that right by renouncing the succession, and that the renunciation of a succession is never presumed, and can only be made expressly, by notarial act. Above all that, we observed that, in adopting article 790 of the French Code, as article 1024 of the Code of 1825, which was retained as article 1031 of the revision of 1870, the Legislature added a paragraph that makes it very plain that, as to a forced heir, in whom the law vests seizin (defined as the right of possession) of the estate without his having to manifest any intention of accepting, it is only one who has renounced who stands to lose by prescription the right to accept the succession, and it is only one who has not renounced who stands to lose by prescription the right to renounce. If that be not true, we ask: Under what possible circumstances could any heir ever lose by prescription the right to renounce a succession? It was virtually conceded by the writers of both opinions in the Succession of Waters, 12 La. Ann. 97, that, under the court's interpretation then of article 1030, the provision for prescription against the right to renounce had no meaning or effect whatever. It cannot be doubted, though, that the Code does make provision, in articles 1030 and 1031, for prescription against the right to renounce. The first paragraph of article 1031 (translated literally from C. N. 790) declares that an heir who has renounced the succession may yet accept it at any time, provided his right to accept be not prescribed, and provided the succession has not been accepted by another heir, and provided, further, that an heir who has renounced cannot afterwards, by accepting the succession, prejudice rights acquired by third persons in the meantime, either by prescription or by lawful dealings with the succession representative. The paragraph added by the Legislature makes it plain that a legal heir who has not formally renounced the succes-

sion can lose by prescription only the right to renounce, viz.:

"In like manner, so long as the prescription of renunciation is not determined, the heir may still renounce, provided he has done no act to make himself liable as heir."

It is suggested by counsel for defendants that our interpretation of article 1030 of the Code is not in accord with the interpretation of some of the French commentators of the corresponding article (789) of the Code Napoléon, and, in support thereof, the attorneys refer to the dissenting opinion in Generes v. Bowie Lumber Co., supra. Our answer is that, as the French commentators entertained eight different and conflicting opinions of the meaning and effect of article 789 of the French Code, we were compelled to depart from at least seven of them. Therefore we adopted the construction which the compilers of the Louisiana Code, having the benefit of the discussions of the French commentators, made very plain.

Referring again to the dissenting opinion in Generes v. Bowie Lumber Co., supra, it is said that, according to Fuzier-Herman (volume 2, p. 91):

"In reality, what is prescribed by 30 years is the right to inherit, which consists of the option of accepting or renouncing."

With due respect, let us say, that is not an accurate translation. What Fuzier-Herman says (vol. 2, p. 91, No. 17), regarding C. N. 789, is, not that it is "the right to inherit," but that it is "the hereditary right itself, consisting of the option between acceptance and renunciation," that is prescribed by 30 years. The language is:

"En réalité, ce qui est prescrit après trente ans c'est le droit héréditaire lui-même consistant dans l'option entre l'acceptation et la renonciation."

It is true, the author adds that the prescription of the right to accept or to renounce a succession has the effect of taking

away from the heir his quality of heir and to cause him to be considered as though he never had the right of heirship. But that, we think, from the further explanation of the author, particularly in comment No. 22, means that the share of an heir who has not formally accepted the succession within 30 years goes to his coheirs who have accepted, or to the heirs of next degree who have accepted, even though such coheirs, or heirs of next degree, have not had possession long enough to acquire the estate by prescription acquirendi causa. In other words, as to a coheir who has accepted the succession, or as to the heir next in degree who has accepted, the heir at law who has not accepted becomes a stranger to the succession at the end of 30 years. But, as to a mere possessor without title and without the benefit of prescription acquirendi causa, the heir at law, who is invested with seizin or the right of possession, by mere operation of the law and without having to manifest an intention to accept the succession, does not lose his right to accept by failing to exercise it within 30 years. How can he lose, by failing to exercise within 30 years, a right which the law says he does not have to exercise at all? What the heir at law stands to lose by the prescription of 30 years (except, of course, as to his coheirs or heirs next in degree who have accepted) is the right to renounce the succession. Our ruling in Generes v. Bowie Lumber Co., in that respect, is consistent with the dissertation of Fuzier–Herman, vol. 2, p. 91, particularly comment No. 22; and what was said on the subject in Harang v. Golden Ranch (on rehearing) is precisely in accord with the French author.

It must be borne in mind that the right of an heir at law to renounce the succession and be relieved of its obligations is an important right, the exercise of which can be made only by notarial act and is therefore

145 La.—5

never presumed. That subject is dealt with in section 2, entitled "Of the Renunciation of Successions," in chapter 6, "Of Successions," in the Civil Code. The provisions of section 2 did not appear in the Code or Digest of 1808, and were not in the French Code. They were inserted in the Code of 1825 for the very purpose of making plain the meaning of article 1030, about which there had been so much discussion and disagreement among the French commentators on the corresponding article (789) of the French Code. When the redactors of the Louisiana Code of 1825 made their report to the Legislature, they inserted section 2, "Of the Renunciation of Successions," regarding which, they said, in their report:

"We thought that order and method required another section to be made separate from all the dispositions of the first section of this chapter of the Code, which [dispositions of the second section] relate to the rejection of successions."

They then inserted the provisions appearing in the revision of 1870 as articles 1013, 1014, 1015, 1023, 1024, 1025, 1026, 1027, and 1028, the last paragraph of article 1021, and the last paragraph of article 1031, none of which provisions appeared in the French Code, and none of which would have any meaning or effect whatever if we should adopt the interpretation put upon article 1030 in the dissenting opinion in Generes v. Bowie Lumber Co.

Another reason why the dissertations of the French commentators on article 789 of the Code Napoléon are not appropriate to the provisions of the Louisiana Code is that all of the provisions of section 2, "Of the Renunciation of Successions," excepting articles 1029, 1030 and 1031, were taken from the Spanish law. Article 1016, for example, is copied from the Digest, book 29, tit. 2, law 51, § 2; article 1022 is taken from the Digest, book 38, tit. 16, law 9; article 1024

comes from book 29 of the Digest, tit. 2, law 21. The provisions of articles 1019, 1020, 1029, 1030, and 1031 were not in the proposed Code of 1825, submitted to the General Assembly, but were inserted by the Legislature, along with the provisions added in explanation of them.

Another important circumstance in the history of our law on the subject of acceptance and renunciation of successions is that the redactors of the Code of 1825 omitted the provisions of article 85 of the Digest of 1808, with this comment:

"The dispositions of this article appear to us contrary to that liberty which every one ought to have, either to accept or reject successions falling to them; for from this article it follows that those heirs who wish to reject the succession will remain beneficiary heirs in spite of themselves, without being able to renounce. We have, for these reasons, substituted the following."

They then substituted articles 1026, 1027, and 1028.

In the light of these explanations of the meaning and effect of article 1030 of the Louisiana Code, we see no reason for perpetuating the confusion into which the commentators on the corresponding article of the French Code wandered for the want of such explanation. To perpetuate the error of the ruling in Succession of Waters, 12 La. Ann. 97, would, as was virtually admitted in both of the opinions delivered in that case, stultify every provision of the Code relating to the renunciation of successions. If, as was held in that case, a legal heir—even a forced heir —who has not formally accepted the succession should become a stranger to the succession by effect of the prescription of 30 years, what meaning or effect could the prescription against the right to renounce ever have, in any case? A legal heir—even a forced heir—for example, at the end of 30 years of silence on his part, would be a stranger to the succession, and would therefore be in the situation of one who had re-

nounced. Surely it could not be said that his right to renounce was barred by prescription, because he would have the full benefit of one who had renounced. And so it would be with regard to an irregular heir, who must take steps to be recognized and sent into possession of the estate. If he did not accept the succession within 30 years, his right to accept would be barred by prescription; he would then remain forever in the situation of one who had renounced. Surely it could not be said that his right to renounce would be barred by prescription, because he would have the full benefit of one who had renounced. Hence it follows that, to hold that a legal heir, who is presumed to have accepted if he does not renounce the succession, loses by the prescription of 30 years his right to accept, would, in effect, suppress every provision of the Code relating to prescription against the right to renounce a succession.

It is argued by counsel for defendants, again quoting the dissenting opinion in Generes v. Bowie Lumber Co., that the interpretation adopted by the majority opinion in that case "runs counter to the provisions of article 977 of the Code, which says that no one can be compelled to accept a succession, in whatever manner it may have fallen to him." We cannot see the inconsistency; for, as every one has 30 years in which to say whether he will accept or renounce a succession falling to him, it can, in truth, be said that "no one can be compelled to accept a succession, in whatever manner it may have fallen to him." The argument is like a revival of the ancient and abandoned idea that all of the laws of prescription and statutes of repose run counter to the constitutional guaranty against the taking of one's property without due process of law.

With regard to article 1030 of the Code, we adhere to our ruling in the recent case of Generes v. Bowie Lumber Company.

All other defenses urged in these suits

were considered and disposed of by our rulings in Harang et al. v. Golden Ranch Land & Drainage Co. and in Harang et al. v. Bowie Lumber Co., and we come to the same conclusion in this case; that is, that the judgments appealed from are correct.

[3] There is no contest between the defendants and the warrantor, except that counsel for the latter call our attention to the fact that they were not given notice of the time and place of taking certain depositions that were introduced in evidence against the defendants, and that, for that reason, their objection to the introduction of the testimony was sustained as to the warrantor, and the evidence was admitted only against the defendants. The evidence did not pertain to any issue between the defendants and the warrantor. The latter had joined the defendants in their defense of the suit. The only purpose for which the warrantor was entitled to be made a party to these suits was to give the warrantor an opportunity to aid in defending the title of the defendants. The ruling, therefore, excluding the evidence as to the warrantor and admitting it against the defendants, against whom it was admissible, did no injustice to the warrantor, and would not justify an annulment of the judgment rendered against the warrantor.

The judgments appealed from are affirmed.

MONROE, C. J., dissents.